**Richard A. MORGAN**

**v.**

**STATE of Maine et al.**

Supreme Judicial Court of Maine.

Feb. 11, 1972.

Bernstein, Shur, Sawyer & Nelson by Sumner T. Bernstein, F. Paul Frinsko, Portland, for plaintiff.

John E. Quinn, Asst. Atty. Gen., Augusta, for defendants.

Before DUFRESNE, C. J., and WEATHERBEE, POMEROY, WERNICK and ARCHIBALD, JJ.

WERNICK, Justice.

This is an appeal from the denial by a single Justice of post-conviction habeas corpus relief sought pursuant to 14 M.R.S. A. § 5502 et seq.

Petitioner claims entitlement to post-conviction remedy on the following grounds: (1) fatal insufficiencies in the indictment for robbery to which he had pleaded guilty, (2) violations of law in the acceptance and entry of his plea of guilty which vitiate the plea and the conviction resting upon it, (3) illegality in the sentence insofar as the presiding Justice allowed matters beyond the Court record to be a factor in the sentencing, and (4) mental incapacity resulting from involuntary intoxication and alleged as a defense to the crime of robbery under the circumstances involved.

## I.

We evaluate, initially, the assertions of insufficiencies in the indictment.[1]

Petitioner says, first, that the indictment, although charging resort to force and violence, is inadequate in that it fails to allege, further, that the victim had been put in fear.

The argument is erroneous. Any misleading implications from language in State v. Perley, 86 Me. 427, 30 A. 74 (1894) or dicta in State v. Greenlaw, 159 Me. 141, 189 A.2d 370 (1963) and State v. Castonguay, Me., 263 A.2d 727 (1970), that "force and violence" and "putting the victim in fear" are conjunctive rather than alternative essential elements of robbery, have now been definitively clarified in State v. Levesque, Me., 281 A.2d 570 (1971). *Levesque* settles that it has always been the law of Maine that "force and violence" and "putting the victim in fear" are alternative delineations of essential elements of the crime of robbery. Petitioner takes nothing by this point.

Petitioner's second assertion is that the indictment omits "to state with particularity a description of the property allegedly taken . . . ." This claim is made in respect to the indictment's description of the property stolen as being "one hundred and twenty-five ($125.00) dollars." Petitioner refers to State v. Thomes, 126 Me. 163, 166, 136 A. 726, 728 (1927) in which it is said that:

"An allegation of simply so many dollars, or so many dollars in money without further description or reason for the omission is too indefinite." (p. 166, 136 A. p. 728)

State v. Thomes, supra, involved an indictment for larceny. Petitioner maintains that the same analysis establishes deficiency in an indictment for robbery which contains larceny as an essential element.

The issue is foreclosed by our decision in State v. Fitzherbert, Me., 242 A.2d 686 (1968) which holds that the statement in *Thomes* upon which petitioner relies is no longer the law "under our new rules of criminal procedure." (p. 688) Whether operative from December 1, 1965 (the date of the new rules) or June 10, 1968 (the date of the decision) *Fitzherbert* governs the present indictment (returned on April 8, 1969.)

Petitioner contends, third, that the indictment alleges only that the offense was committed in Cumberland County without particularizing a specific place in the County. In Cookson v. State, Me., 237 A.2d 589 (January 26, 1968), we decided, regarding the crime of assault, that when an indictment charges a crime in which place is not an essential element, the allegation of place serves only to fix the venue of the prosecution; and for this purpose an allegation of County will suffice. Since place is not an essential element of the crime of robbery, under the governing effect of *Cookson,* the allegation of the present indictment (April 8, 1969) that the offense was committed in Cumberland County is adequate.

## II.

More complex are the issues raised by petitioner's claim that his plea of guilty entered by the Court on September 27, 1969 is automatically vitiated by the failure of the trial judge to comply with Rule 11, M. R.Crim.P.—as alleged to require that there be made a record (1) in the proceeding in which the judgment of conviction was entered (2) by the particular method of an *interrogation* conducted by the judge and

---

1. The indictment charged:
 "On or about the 17th day of February, 1969, in the County of Cumberland, State of Maine, Richard A. Morgan did by force and violence take, steal and carry away the property of Samuel Hider, to wit, one hundred and twenty-five ($125.-00) dollars from the person of Samuel Hider with the intent to permanently deprive the owner of his property."

addressed to the defendant (now the petitioner) personally, which (3) reveals, adequately, an *affirmative* showing of underlying facts that (a) the guilty plea was made voluntarily and with understanding of the nature of the charge, and (b) defendant had in fact committed the acts charged as criminal against him.

During the past two and one-half years, this Court has had occasion to deal with potential interrelationships among our own Rule 11 M.R.Crim.P., the federal Criminal Rule 11 and the Constitution of the United States—especially in light of two leading decisions of the Supreme Court of the United States in McCarthy v. United States, 394 U.S. 459, 89 S.Ct. 1166, 22 L. Ed.2d 418 (April 2, 1969) and Boykin v. Alabama, 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (June 2, 1969).

In Child v. State, Me., 253 A.2d 691 (1969); Grass v. State, Me., 263 A.2d 63 (1970); Wilson v. State, Me., 268 A.2d 484 (1970); and most recently Cote v. State, Me., 286 A.2d 868 (1972); we confronted guilty pleas which had been tendered, accepted and entered on dates prior to the decisions handed down in both *McCarthy* and *Boykin*. We found that it was unnecessary to decide controlling law in those cases regarding particular issues deemed precipitated by either *McCarthy* itself or *McCarthy* conjoined with *Boykin* on the grounds that, as to any guidance afforded by *McCarthy* or any governing effect which might be attributed to *McCarthy* under *Boykin* as to the law of Maine, Halliday v. United States, 394 U.S. 831, 89 S.Ct. 1498, 23 L.Ed.2d 16 (May 5, 1969) had held that the decision of *McCarthy* would be declined retroactive application.

In the present case, however, we meet a guilty plea tendered, accepted and entered *subsequent* (September 27, 1969) to both *McCarthy* and *Boykin*. We, therefore, can no longer postpone evaluation of the issues crystallized by the import of *McCarthy* separately or as combined with *Boykin*.

In an extended discussion most recently presented in *Cote* we took opportunity to elucidate significant aspects of the law of Maine as operative prior to the effective date of Rule 11 M.R.Crim.P.,--December 1, 1965.

We recognized in *Cote* that one effect of the law of Maine had been that a defendant, by virtue of the formal entry of a plea of guilty (or nolo contendere) was, without trial, validly convicted of crime and subjected to the imposition of criminal penalty on the principle that the formal conclusory plea of guilty (or nolo contendere) appearing of record was sufficient as proof of defendant's consent. Validity was established without need that the plea be accompanied on the record by an affirmative showing of additional underlying factual information adequate to establish that defendant's consent had been in fact voluntarily and understandingly given. Further, the conviction and imposition of penalty remained valid unless and until the defendant could produce evidence sufficient to meet the ultimate burden of proof cast upon a defendant who had entered a formal plea of guilty upon the record that he establish, by a fair preponderance, that the guilty plea of record was in fact tendered *involuntarily* or *without understanding* and was, therefore, *constitutionally defective*.

■ The milestone significance of the decision of the United States Supreme Court in *Boykin* (June 2, 1969) is that it holds such approach violative of federal due process. *Boykin* requires, as a precondition of the constitutionality of the imposition of criminal penalty purported to be justified by the consent of the defendant, that *more* appear affirmatively of record than merely the entry of the formal plea of guilty. The new constitutional feature developed in *Boykin* is aptly summarized in Brady v. United States, 397 U.S. 742, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970) in the following language:

"The requirement that a plea of guilty must be intelligent and voluntary to be

valid has long been recognized. . . . The new element added in *Boykin* was the requirement that the *record* must *affirmatively* disclose that a defendant who pleaded guilty entered his plea *understandingly* and *voluntarily*." (n. 4, p. 747, 90 S.Ct. p. 1468, n. 4) (emphasis supplied)

*Boykin* thus mandates, as requisite under the federal Constitution by virtue of the Fourteenth Amendment as binding upon the States, a shift of responsibility regarding the record. *Boykin* forbids a system which allows a conviction of crime and consequent imposition of criminal penalty to be justified as consensual merely on the basis of a formal plea entered of record and by resort to the rationale that the entry of the plea on record carries a regularity sufficient to cast upon the defendant who tendered that plea an ultimate burden of proof to show, preponderantly, that it was in fact tendered involuntarily or without understanding. *Boykin* introduces the imperative that a consensually based conviction of crime and imposition of criminal penalty can be valid under the federal Constitution only if the formal plea, held to be the consent of the defendant, is supported on the record by the disclosure, additionally, of *underlying factual information* adequate to show *affirmatively* that the formal plea of record was *in fact* a *voluntary* and *understanding* consent by defendant—including the *waiver* of constitutional rights and privileges—to be subjected to the imposition of criminal penalty.

■ It is now abundantly clear that the portion of Rule 11 M.R.Crim.P., which charges the trial judge that he is not to accept a guilty plea

"without first . . . addressing the defendant personally and determining that the plea is made voluntarily with understanding of the nature of the charge. . . . "

provides a method designed to implement a shift in the responsibility to make an affirmative record containing underlying facts showing that defendant's plea had been made voluntarily and understandingly.

As *Cote* explains, the State of Maine had, regardless of the retroactivity of *Boykin,* apprehended the wisdom of requiring such shift as part of its own policy. Rule 11 M.R.Crim.P. seeks to achieve such a record, *initially,* by imposing upon governmental authority (the trial judge) the obligation to make the record in a highly effective manner and at a most opportune time. *Cote* reveals that this policy choice is further implemented, even as to a pre-*Boykin* plea, by the recognition that the promulgation of Rule 11 M.R.Crim.P. had resulted in the principle that, in the ultimo, the State must bear the burden of establishing that a plea of guilty is supported by a record showing affirmatively underlying facts sufficient to support a plea of guilty as voluntarily and understandingly tendered.

Having said this much, however, we must recognize further that many Courts have viewed *Boykin,* at least as to post-*Boykin* pleas, as imposing an *additional* federal constitutional mandate. They decide, as petitioner claims we should hold in the case at bar, that *Boykin* demands that the validity of a guilty plea is to be tested for constitutional regularity, and to be sustained or adjudicated invalid, *solely and exclusively* upon a record which is confined to the proceedings in which the judgment of conviction was entered and which had been developed *solely and exclusively* by the specific method of a judge-conducted interrogation addressed to the defendant personally.

In *Grass,* we stated by dictum (since a pre-*Boykin* plea was involved and no decision was made as to the retroactivity of the *Boykin* requirement of an affirmative record of voluntariness and understanding) our conception of the intended scope of *Boykin,* as a *constitutional imperative,* as follows:

"Although the Court [in Boykin] indicated its preference for some equivalent

of F.R.C.P., Rule 11 as a device for assuring the making of an adequate record, there is no suggestion that *Boykin* would be applied to the states in any case in which the state court record *in its entirety* demonstrated that the plea had been tendered voluntarily and understandingly. . . . if that be so, an independent showing of voluntariness in post-conviction proceedings will suffice to satisfy the constitutional requirements imposed upon the states by Boykin. . . .." (263 A.2d p. 65)

Likewise, by dictum in *Cote,* we reaffirmed the dictum of *Grass* and mentioned explicitly that we were aware of the statements made in a concurring opinion in the recent case of Santobello v. New York, December 20, 1971, 404 U.S. 257, 92 S.Ct. 495, 30 L.Ed.2d 427, by Justice Douglas, the writer of the Court's opinion in *Boykin.* We stated in *Cote* our belief that the remarks of Justice Douglas in *Santobello* required no change of our views as offered in *Grass.*

■ In Dow v. State of Maine, Me., 275 A.2d 815 (1971) we had held that a defendant who has been convicted upon his plea of guilty is without right to have a review of the judgment of conviction by *direct appeal* regarding:

"voluntariness of the plea, knowledgeability of the defendant regarding the consequences thereof, compliance or non-compliance with the requirements of . . ., Rule 11, M.R.Crim.P., ineffec-

tive assistance of counsel in connection therewith, misrepresentation, coercion or duress in securing the plea and insanity of the pleader." (p. 820)

Review is available only in post-conviction proceedings.[2]

Thus, two salient features of the system presently in effect in Maine appear.

First, by the operation of Rule 11 M.R. Crim.P., there is utilized a general methodology which strives to achieve a most effective and chronologically superior record by which the formal plea of guilty is amplified with a record which shows, in adequate affirmative manner, those aspects of voluntariness and understanding which are constitutionally requisite to the validity of the imposition of criminal penalty, without trial, by virtue of the consent of the defendant.

■ Second, however, although the Maine system acknowledges the desirability of producing such record at the inception, it declines to equate desirability with indispensability. Hence, automatic, per se invalidation of a guilty plea for a failure of compliance with the methodology of Rule 11 is avoided by the requirement that the review of the validity of a guilty plea, as having been voluntarily and understandingly made, must be undertaken as an incident of post-conviction proceedings in which a supplemental record may be made by introduction of additional evidence unrestricted as to source,[3]—provided that it is admissible under evidentiary principles.

2. *Dow* recognized as one exception the situation in which a timely motion to withdraw the plea of guilty on any of the above enumerated grounds has been denied at the trial Court level because there would have been an evidentiary hearing in the trial Court on the issues.

Insofar as *Dow* indicates, in light of our decision in Higgins v. Robbins, Me., 265 A.2d 90 (1970), that declaratory judgment relief might also be "jurisdictionally available in a case where post-conviction habeas corpus could have been maintained" (275 A.2d p. 820)—in addition to the remedy of post-conviction habeas corpus,—it is sufficient for pres-

ent purposes for us to observe that in a declaratory judgment proceeding the parties are likewise, as in post-conviction habeas corpus, entitled to a full evidentiary hearing on the issues raised.

3. In this connection, see: People v. Taylor, 383 Mich. 338, 175 N.W.2d 715 (1970). The opinion for the Court written by Chief Justice Brennan justifies the need of an evidentiary proceeding, to supplement the "quasi-administrative" functioning of the trial Judge, on the basis of the essentially factual nature of the determination of "voluntariness."

■ While our dicta in *Grass* and *Cote* have been forecasts of our views, we must now decide squarely for purposes of establishing the controlling law of Maine whether, as to a plea of guilty tendered and entered on September 27, 1969 and in light of the decision in *Boykin* on June 2, 1969, the framework within which Maine presently operates is constitutionally permissible.

As we previously observed, many courts have rejected the view which we suggested in *Grass*, and repeated in *Cote*, that it is consistent with *Boykin* to utilize a post-conviction record to *uphold*[4] the validity of a guilty plea as voluntary and understanding in the constitutionally requisite sense. State v. Sisco, Iowa, 169 N.W.2d 542 (1969); Flint v. Sharkey, R. I., 268 A.2d 714 (1970). See also: People v. Rizer, 5 Cal.3d 35, 95 Cal.Rptr. 23, 484 P.2d 1367, 1370 (1971); Consiglio v. Warden, 160 Conn. 151, 276 A.2d 773 (1970); Lucas v. Commonwealth, Ky., 465 S.W.2d 267 (1971). And cf. People v. Williams, 44 Ill.2d 334, 255 N.E.2d 385, cert. den. 399 U.S. 914, 90 S.Ct. 2216, 26 L.Ed.2d 571 (1970); Ernst v. State, 43 Wis.2d 661, 170 N.W.2d 713 (1969).

We believe, however, that our understanding, as stated in *Grass* and *Cote*, remains correct. Cases seeming to support this view are: People v. Taylor, 383 Mich. 338, 175 N.W.2d 715 (1970); State v. Coe, 290 Minn. 537, 188 N.W.2d 421 (1971); Stocks v. Warden, Nevada State Prison, Nev., 476 P.2d 469 (1970).

We agree that *Boykin* holds that a State Court reviewing a record *appropriately before it under the system of review provided by the State* would commit reversible constitutional error were it to sustain the guilty plea even though the record under review fails to reveal, over and above the formal entry of the guilty plea itself, an adequate affirmative showing of additional underlying factual information to support the conclusion that the plea was voluntarily and understandingly made.

Concomitantly, however, we are resolute in our opinion that the *reversal* of the State Court conviction adjudicated in *Boykin* is without further constitutional significance. Special procedural factors establish that decision to be a narrow, unique phenomenon confined to the facts of the case rather than the formulation of a broad, generalized constitutional principle forbidding resort to a post-conviction record to sustain the validity of a State Court conviction resting upon a guilty plea.

The critical procedural aspects of *Boykin* were that (1) the State of Alabama had mandatorily required a *direct appeal* as the state mechanism for review of the validity of a judgment of conviction in a capital case, (2) Alabama statute charged the reviewing Court with the obligation in *the direct appeal* "to comb the record for 'any error prejudicial to the appellant, even though not called to . . . attention in brief of counsel.'" (p. 241, 89 S.Ct. p. 1711).

In addition, the Supreme Court of the United States found it crucial, as the basis upon which is could assert its own jurisdiction consistently with Cardinale v. Louisiana, 394 U.S. 437, 89 S.Ct. 1161, 22 L.Ed.2d 398 (1969), that:

"on their own motion, . . . four of the seven justices [of the Alabama Supreme Court] discussed",

explicitly, the constitutional aspects of whether the guilty plea had been tendered by the defendant knowingly and understandingly; three of them in dissent had found a constitutionally inadequate record;

---

4. In the analysis to follow we shall be intimating no suggestion as to the standards applicable to the effort by the defendant to *nullify* a guilty plea, as involuntary or non-understanding, by undertaking to go outside, or to contradict, a record made *in full compliance with Rule 11*. See: United States v. McCarthy, 433 F. 2d 591, 593 (1st Cir. 1970); Raymond v. State, Me., 251 A.2d 509, 510 (1969).

and a fourth justice, in separate concurrence, had purported to sustain the constitutionality of the "silent" record by "refusing '[f]or aught appearing' 'to presume that the trial judge failed to do his duty.'" (395 U.S. p. 240–241, 89 S.Ct. p. 1711)

Under the Maine system, however, and in accordance with the principle that available State procedures must be exhausted before federal habeas corpus will lie, Picard v. Connor, 404 U.S. 270, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971), this Court must have made a decision upon its review of *both* the conviction and post-conviction records before the case can assume a posture in which it would properly come before the Supreme Court of the United States with jurisdiction reposing in that Court, in accordance with Cardinale v. Louisiana, supra, to assess the constitutional adequacy of the record on the basis of *Boykin.*

For this reason, we find most impressive the analysis of Mr. Justice Roberts in his concurring opinion in Commonwealth v. Godfrey, 434 Pa. 532, 254 A.2d 923, 926 (1969). Mr. Justice Roberts convincingly argues:

"The fact that we require an on-the-record inquiry when a guilty plea is accepted does not, in my view, also require us to automatically wipe out the plea if no such inquiry is made. *Boykin* clearly says that we may not, without *more,* allow the plea to stand. . . . But where the state system provides a mechanism for fairly establishing a record and determining the validity of the guilty plea, I do not believe that the Supreme Court of the United States meant to—or properly could—mandate a prophylactic rule that the states would be required to follow, to overturn pleas *proven* valid on a *full* record. . . .

"I agree with the statement in *Boykin* that an on-the-record inquiry by the judge accepting the plea 'forestalls the spin-off of collateral proceedings that

seek to prove murky memories.' 89 S.Ct. at 1713. . . .'. Yet although I obviously agree with this statement, I do not take it to mean that state hearing procedures for determining the validity of guilty pleas are inherently unreliable. I would find this position to be wholly untenable and unsupported in fact or law and I cannot accept it as constitutionally requiring the automatic overturn of guilty pleas where an on-the-record inquiry by counsel or the judge accepting the plea is absent. This would call into question the basic reliability of the entire state constitutional fact finding process, a position inconsistent with general theory of criminal review in the federal system. See, e. g., Jackson v. Denno, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964); Fay v. Noia, 372 U.S. 391, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963)." (254 A.2d p. 927)

Furthermore, North Carolina v. Alford, 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970) seems to clarify that the Supreme Court of the United States has recognized, as consistent with *Boykin,* that even though a State court trial judge might have failed within the confines of an *interrogation conducted by him of the defendant personally* to make an adequate affirmative record of voluntariness and understanding, the guilty plea can be salvaged, constitutionally, by resort to the evidence presented in post-conviction proceedings.

In *Alford* the trial judge allowed an attorney to conduct the interrogation of the defendant to bring out the underlying facts "that his counsel had informed him of the difference between second- and first-degree murder and of his rights in case he chose to go to trial." (pp. 28–29, 91 S.Ct. p. 163) Apparently, this information was all that the record of the conviction proceeding disclosed regarding defendant's knowledge of the "consequences of his plea of guilty." The trial judge had asked the defendant, as to voluntariness and understanding, only, as the Supreme Court of

the United States summarized the purport of the question:

"if, in light of his denial of guilt, he still desired to plead guilty to second-degree murder" (p. 29, 91 S.Ct. p. 163)

to which defendant replied in a conclusory way:

" 'Yes, . . .. I plead guilty on—from the circumstances that he [Alford's attorney] told me.' " (p. 29, 91 S.Ct. p. 163)

It was in regard to the specific subject-matter of the information possessed by *Alford* of the "consequences of a plea of guilty" that the Supreme Court of the United States in *Alford* saw fit to add a footnote reading:

"At the state court hearing *on post-conviction relief*, the *testimony* confirmed that Alford had been fully informed by his attorney as to his rights on a plea of not guilty and *as to the consequences of a plea of guilty. Since the record in this case affirmatively indicates that Alford was aware of the consequences of his plea of guilty* and of the rights waived by the plea, no issues of substance under Boykin v. Alabama, 395 U.S. 238, 89 S. Ct. 1709, 23 L.Ed.2d 274 (1969), would be presented even if that case was held applicable to the events here in question." (n. 3, p. 29, 91 S.Ct. p. 163 n. 3) (emphasis supplied)

We interpret this language to reveal an express recognition by the Supreme Court of the United States, subsequently to the decision in *Boykin*, that *Boykin* permits a State Court to resort to *evidence adduced in post-conviction proceedings* to find affirmative record support that a guilty plea was voluntarily and understandingly tendered.

We conclude that *Boykin* fails to render unconstitutional the Maine system for the review of guilty pleas as first postured by dictum in *Grass*, subsequently implemented in *Dow* and reaffirmed by dictum in *Cote*.

To the extent that a decision is now necessary to cover pleas made in the Maine Courts post-*McCarthy* and -*Boykin* in time, we explicitly hold that vitiation of a plea of guilty which is tendered after either April 2, 1969 (*McCarthy*) or June 2, 1969 (*Boykin*) fails to result, *automatically* and *per se*, from the omission, or inadequacy, of a judge-conducted interrogation addressed to the defendant personally in the conviction proceeding itself. We decide that a guilty plea is vitiated under the mandate of *Boykin* only if the *total record* appropriately under review fails adequately to establish a factual matrix—over and above its showing of the existence of a formally entered conclusory plea of guilty —by which the plea is affirmatively shown to have been voluntarily and understandingly made.

By this decision Rule 11 M.R.Crim.P. plays a significant role as delineating the methodology to achieve an initial affirmative record which, hopefully, will have a sufficient "clincher" import to forestall "the spin-off of collateral proceedings." To the extent, however, that there might be a failure of the Court adequately to follow the Rule 11 methods we have made a deliberate policy choice, since we interpret *Boykin* to allow us the constitutional freedom of such choice, to avoid the strictures, which we regard as unduly and unnecessarily severe, of the *per se* error approach of *McCarthy*. We believe that the best record—i. e., the "button-up" type record which Rule 11 M.R.Crim.P. aims to accomplish—is not the *only constitutionally adequate* record. So long as we require, as *Cote* shows that we do, that the State, in post-conviction proceedings, bear the ultimate burden of establishing a total record which adequately shows in an affirmative manner subsidiary facts (over and above the fact that a formal guilty plea was tendered and accepted) constituting the plea as one voluntarily and understandingly made, there is a sufficient safeguard of a defendant's constitutional rights and privileges to comply with the constitutional imperatives of *Boykin*.

There is a second facet generally discussed in relation to the validity of a guilty plea. It is delineated in Rule 11, M.R.Crim.P. by the language that the Court is to make "such inquiry as may satisfy it that the defendant in fact committed the crime charged." This appears in the rule as a specification separate from the instruction that the Court is to determine "that the plea is made voluntarily with understanding of the nature of the charge."

In *Cote* we formally decided, as to this specific aspect of Rule 11 M.R.Crim.P., that it would be treated as inapplicable to pleas of guilty (or nolo contendere) entered prior to the date of *Child,* May 26, 1969. Thus, in practical effect,—and regardless of correctness of the reasons which might have led to the situation—we have treated this part of Rule 11 M.R.Crim.P. as if it first appeared with operative effectiveness on May 26, 1969. For this reason, we further said in *Cote* that its scope, both in terms of the meaning of the language as a directive as well as the effect to be assigned to the failure of the trial judge to comply with its requirement, would be left for decision in a future case in which a plea tendered after May 26, 1969 would be factually involved.

Now before us is such a case in which, as to a plea tendered on September 27, 1969, we are called upon to decide (1) regarding the meaning of the Rule 11 M.R.Crim.P. requirement that there be inquiry into whether defendant in fact committed the crime charged as well as (2) the effect should there be failure of the trial judge adequately to comply with the directive.

The singling out in Rule 11 M.R.Crim.P. for separate treatment of the fact relating to an inquiry into whether defendant in fact committed the crime must not be taken to connote that this requirement is totally unrelated to the fundamental constitutional factors of a consent *voluntarily* and *understandingly* given. On the contrary, as will now be shown, it is definitely linked to the voluntariness and intelligence with which a defendant gives consent that he be subjected, without a trial, to the imposition of criminal penalty.

The language of our Rule 11 M.R.Crim. P., in the respect now under consideration, is a verbatim counterpart of the First Preliminary Draft of Proposed Amendments to the Federal Criminal Rule 11 and which appeared in 1962 (for text, see: 31 F.R.D. 673). Of this Preliminary Draft it was said in the Advisory Committee's Note, regarding the present subject-matter, that the provision was being proposed to prevent a defendant from pleading guilty "without realizing that his conduct does not actually fall within the charge." 31 F.R.D. 673.

Since the language of the Maine Rule is the identical language counterpart of the 1962 First Preliminary Federal Draft, the objective attributed to the initially conceived Federal language may properly be regarded, nothing to the contrary appearing, as the fundamental objective underlying Rule 11, M.R.Crim.P. The point is corroborated by the Commentary in *Glassman,* Maine Practice, Rules of Criminal Procedure in which it is said that the design is

> "to assure . . . that a defendant does not plead guilty without realizing that his conduct does not fall within the offense charged." (pp. 101–102)

The *Glassman* Commentary suggests the additional safeguard consideration that

> ". . . a defendant does not plead guilty out of a sense of hopelessness while at the same time believing himself to be innocent." (p. 101)

Manifestly, the concerns expressed in the Federal Advisory Committee's Note and in the *Glassman* Commentary relate to the voluntary and understanding nature of the consent to the imposition of criminal penalty as formally conveyed by the tendering of the plea of guilty. Lack of realization of how the facts fit within legal concepts is a facet of ignorance and thus pertains to whether a plea of guilty has been knowing-

ly and understandingly tendered. Conduct produced by a sense of "hopelessness" which is contrary to true belief is conduct which might well be impaired as a free choice and, thus, the voluntariness of the behavior is brought in issue.

Hence, the separately expressed concern in Rule 11 M.R.Crim.P. with an "inquiry" into whether "defendant in fact committed the crime charged" is to be recognized, as, fundamentally, the delineation of a back-up, double-check upon the voluntary and understanding nature of a plea of guilty as a consent by defendant to be subject to the imposition of criminal punishment. It is an *anticipation* of the *possibility* of a defendant's ignorance as to a particular type of legal significance and the possibility of hopelessness, or despair, which a defendant might experience in the face of the overwhelming power of a government which has chosen to accuse him and the possibility that he would feel it futile to resist, (or perhaps even beneficial in the hope of currying favor to agree with), the accusation. In this aspect, Rule 11 M.R.Crim.P. purports to delineate a generalized procedure to ensure in every instance in which consent is the justification for the imposition of criminal punishment that a reasonable effort will be made to *negate particular anticipated possibilities* which tend to be latent and which might not come to light unless a reasonable effort to probe for them is made.

Thus viewed, the provisions of Rule 11 concerning the inquiry into whether "defendant in fact committed the crime charged" is a *policy choice* made by the State of Maine which, even though having constitutional overtones by relationship to voluntariness and understanding, is *not* a procedure mandated as a *federal constitutional* imperative. *Boykin* holds only that the federal Constitution requires a record in the conviction proceeding revealing affirmatively sufficient underlying facts to justify a conclusion that the consent is voluntary and intelligent. *Boykin* does *not* require a record which *affirmatively antic-*

*ipates,* and negatives, *every possibility* which a defendant might later raise to show that his plea of guilty was either involuntary or without understanding.

Over and above the point that separate treatment emphasizes that it is a policy factor rather than one constitutionally requisite, there is a particular feature of our Rule 11 M.R.Crim.P. which makes necessary separate delineation of the requirement of inquiry into whether defendant in fact committed the crime charged.

The generalized instruction that the Court shall determine that "the plea is made voluntarily and with understanding of the nature of the charge" directs that the Court follow the particular procedure of "addressing the defendant personally." This is applicable not only to pleas of guilty but also to pleas of nolo contendere. Thus, separate treatment must be given to the "inquiry" into whether "defendant in fact committed the crime charged" precisely to exclude the applicability of the requirement of addressing the defendant personally. Otherwise, there would exist the anomaly that a defendant who is pleading nolo contendere would be required to confess from his own lips his factual commission of the crime; and the essence of the plea of nolo contendere would be destroyed.

This analysis reveals one reason that we must now decide, as we have recently indicated by dictum in *Cote,* that we recede from the dictum of *Grass* which purported to offer a "construction" of a dictum in *Child.*

In *Grass,* we had "construed" *Child* to have "construed" Rule 11 M.R.Crim.P.,— and as we clarified in *Cote,* even though the literal language of the rule fails reasonably to connote such specific meaning —"that the sentencing Justice must address the defendant personally and satisfy himself *through that interrogation* that 'the defendant in fact committed the crime charged' . . . ." (263 A.2d p. 65) In effect, therefore, we were, by dictum, judi-

cially "construing" Rule 11 M.R.Crim.P. to be instructing the trial judge to produce a record revealing not only the tendering by defendant of a formal conclusory plea of guilty but also an independent *express* "confession" by the defendant in open court of the essential subsidiary facts.

As we have said, our Rule 11 M.R. Crim.P. had elected to have the specification regarding inquiry into factual merits refer explicitly not only to guilty pleas *but also to pleas of nolo contendere.* Hence, the "construction" assigned to the dictum in *Child* by the dictum in *Grass*— that an on the record confession by a defendant of his factual guilt must be procured by a judge-conducted interrogation— cannot meaningfully be read into Rule 11 M.R.Crim.P. without frustration of the basic purpose of the plea of nolo contendere, that the defendant shall not be taken as, in any respect, confessing his guilt in fact.

It might be argued, however, that this dictum of *Grass* should not be totally abandoned; that even though it must go in relation to nolo contendere pleas, it remains desirable as applied to pleas of guilty the import of which is a confession of factual guilt of the crime.[5]

It is now clear in light of the decision in *Alford*, however, that the federal Constitution is without effect to require an on-the-record open court express confession by the defendant, supplementing his formal plea of guilty, as an essential constitutional element of a valid consent by a defendant to be subjected (without trial)

to the imposition of criminal penalty. In the precise language of *Alford* ". . . an express admission of guilt, . . . is not a constitutional requisite to the imposition of criminal penalty." (400 U.S. p. 37, 91 S.Ct. p. 167)

Experience teaches us that, frequently, a defendant who is offering to consent to the imposition of criminal penalty can be ascertained to be acting voluntarily and understandingly, even though, for special reasons of his own which do not impair the voluntary or understanding nature of his consent, he might be, to use the language of *Alford*, "unwilling or unable to admit his participation in the acts constituting the crime." (p. 37, 91 S.Ct. p. 167) In these situations it is often desirable that there be a disposition of the case on a consent basis, without trial. The use of the nolo contendere plea, however, might, in the circumstances, be contrary to the public interest in the effective administration of justice. Thus, it would be of benefit that the alternative of a disposition by use of the guilty plea be available (since *Alford* shows that it would be constitutional),—especially if a reasonable effort is made to expose latent menaces to the existence of a voluntary and understanding consent by the addition of an appropriate inquiry into whether the defendant in fact committed the crime charged.[6] To the extent, therefore, that the dictum in *Grass* construing *Child* precludes use of the guilty plea in the foregoing circumstances—because of the insistence upon the procuring of an express open court factual confession of guilt

---

5. "A voluntary plea of guilt when understood by a respondent has always been considered a solemn confession from the only person who 'had the best possible knowledge of the truth.'" Jenness v. State of Maine, 144 Me. 40, 44, 64 A.2d 184, 186 (1949).

6. We consider it the better practice in Maine, however, to avoid use of the guilty plea in circumstances (such as appeared in *Alford* itself) in which the defendant is affirmatively insisting on his innocence (rather than merely being unwilling or unable to make an express open court confession of factual guilt). Since Maine does not impose the death penalty, a defendant who is protesting his innocence but yet wishes to have his case disposed of by consent, without trial, —and if it should be inexpedient in light of the public interest in the efficient administration of justice to allow use of the plea of nolo contendere—should have a plea of guilty disallowed and the Court should require guilt to be proved in a trial.

from a defendant who is unwilling or unable to give it—it is seen to impose an unnecessarily stringent requirement which we should no longer follow.

■ We, therefore, now adopt as controlling law the principle most recently announced as a strong dictum in *Cote.* We decide squarely that the inquiry specified in Rule 11 M.R.Crim.P. into whether the defendant in fact committed the crime is *not required* to be—(although it is permissible that it include, when possible)—a judge-conducted interrogation of the defendant personally through which interrogation answers by the defendant are placed on the record which show that the defendant in fact committed the crime charged.

Having thus decided what the inquiry need not be, we now evaluate, affirmatively, what it should be. We reach our conclusions, in this aspect, in the light of our prior analysis which discloses a strong connection between the investigation of whether "defendant in fact committed the crime" and the voluntariness and intelligence of defendant's consent to the imposition of criminal penalty, without trial. By placing emphasis upon this specific factor, we are not to be understood as ignoring other generalized purposes which might be indirectly involved or promoted,—especially the usual concern which any Court has that a person who is in fact innocent of crime shall not be subjected to the imposition of criminal punishment. To the extent that inquiry into the factual matrix underlying the charge against a defendant —having as its primary purpose the discounting of the possibility that the facts fall outside the legal scope of the charge or that defendant is acting from a sense of hopelessness or despair—tends to assist in protection of the innocent, so much the better. Our point, however, is that when a defendant is consenting to the imposition of criminal penalty without a trial—(as distinguished from the situation in which he is demanding a trial)—our main objective is to provide a record which shows

that it is *not unreasonable* to conclude that the defendant is *in fact guilty* as charged —(as distinguished from a record, in the situation in which trial is demanded, which proves that it *is unreasonable* to conclude that the defendant is *in fact innocent* of the charge).

■ We decide, therefore, that the facet of Rule 11 M.R.Crim.P. now under study signifies that the trial judge is instructed to conduct an "inquiry", and thereby *to make a record,* using such sources as he deems appropriate, which justifies a *reasonable conclusion* that the defendant in fact committed the crime charged.

From such record, the Court, supplementarily, might be in a position to prevent a defendant who is in fact innocent of the crime charged from being criminally penalized for it. However, since the requirement of "inquiry" into whether defendant in fact committed the crime charged is directed—(in the situation in which a defendant by consent is striving to avoid the need of a trial whether by a jury or a judge)—predominantly toward a reasonable effort to expose latent possibilities of ignorance as to whether the facts fall within the legal meaning of the crime or as to a potential lack of voluntariness in terms of actions induced by hopelessness, or despair—(rather than toward a requirement that there be an actual adjudication, upon evidence, that the defendant is in fact guilty as charged)—the trial judge is not required to magnify an indirect concern to protect the innocent to the dimension that it becomes the overriding consideration demanding a judicial evidentiary determination of factual guilt. Hence, the trial judge may make the appropriate inquiry within the meaning of Rule 11 M.R.Crim. P. by making on the record inquiries (which need not involve sworn testimony) of the prosecutor or of other persons whom the prosecutor presents as having relevant and material information, or by examining and placing upon the record any

documents which are made available and which contain adequate factual information relating to whether defendant in fact committed the crime charged, or the judge may (but need not) inquire on the record of the defendant himself. Furthermore, the trial judge is not required to become involved with resolving possible discrepancies in the factual information or with reaching conclusions as to the credibility of persons who might be offering information which is not entirely consistent—thereby to allow for an *adjudication* of guilt. So long as the information which the trial judge places on the record warrants a reasonable conclusion that the defendant in fact committed the crime, the requirements of Rule 11, in this regard, are satisfied.[7]

There remains for decision the effect to be attributed to the omission of the trial judge to make an adequate record, by an appropriate inquiry, which warrants a reasonable conclusion that defendant in fact committed the crime.

 By force of our prior analysis concerning the record as to the other procedural specifications of Rule 11 we now conclude, by parity of reasoning, that the failure of the trial judge to make the appropriate inquiry and record warranting a reasonable conclusion that defendant in fact committed the crime will be without

effect to produce an automatic, per se, vitiation of the plea.

Nevertheless, and even though we have previously stated that the type of record which we are now discussing is *not* one which is constitutionally required by *Boykin* but rather represents a policy choice of the State of Maine, we believe that the incorporation of such a policy into a Rule of Court reflects a sufficient importance to require that the failure to comply with it should not be trivial or without impact to place the validity of the plea in jeopardy. To provide incentive for scrupulous compliance we decide, as our own policy, that the failure of the trial judge to make the appropriate inquiry into, and record of, whether defendant in fact committed the crime will result in a casting upon the State of the burden of ultimate proof to make a total record which may include the record of post-conviction proceedings as well as that of the conviction proceedings. This total record must disclose factual information which warrants a reasonable conclusion that defendant had in fact committed the crime charged against him and which, if not presented to the trial judge, could have been presented to him had he inquired adequately for it in the conviction proceedings. If the State fails to meet such ultimate burden of proof, the defendant will be entitled to plead anew.[8]

7. It seems clear that Federal Criminal Rule 11 was amended in 1966 with a language change from inquiry into whether "defendant in fact committed the crime charged" (the wording proposed in the 1962 First Preliminary Draft) to "factual basis for the plea" because it was felt that the latter language better reflected the points which we have hereinbefore stated. See 8 Moore's Federal Practice-Cipes, Criminal Rules at pages 11–47, 11–48 and including footnotes 30 and 31.

In practical effect, we have interpreted the language of our Rule 11 M.R.Crim.P. —because we conceive no basic difference to have been intended by our retention of the wording proposed in the First Preliminary Draft of 1962—to have the same meaning as that signified by the words "factual basis for the plea."

8. Cf. Manley v. United States, 432 F.2d 1241 (2nd Cir. 1970) in which, as to a guilty plea entered *after* the "factual basis for the plea" requirement of Federal Criminal Rule 11 had become effective in 1966 but *before McCarthy* (April 2, 1969) the Second Circuit considered itself free, by virtue of *Halliday* which had decided the non-retroactivity of *McCarthy*, to present its own judgment as to the effect of a failure of the trial judge to comply with the "factual basis for the plea" directive. The Court decided that the plea could be sustained as valid only upon a supplemental record showing the existence of information constituting such "factual basis for the plea" and of which the trial judge had been aware.

We decline, in the formulation of our own State policy, to require a post-convic-

We consider now the bearing of these principles upon the circumstances which are before us for decision.

The primary contention of petitioner is that *Boykin* had constitutionally imposed the per se error doctrine of *McCarthy* upon the States and, therefore, the failure of the trial judge to follow the procedural directives of Rule 11 M.R.Crim.P. (equivalents of those dealt with in *McCarthy*) automatically vitiates the validity of petitioner's plea of guilty and entitles him to plead anew.

Petitioner has alleged as violations of Rule 11 that (1) the trial judge elicited the information necessary to support the validity of the plea as voluntarily and understandingly tendered, as well as that purporting to warrant a conclusion that defendant in fact committed the crime charged (a) other than by addressing the petitioner in an exclusively individualized personal way (the trial judge having interrogated petitioner, in part, jointly with a co-defendant) and (b) other than by having answers from petitioner which reflected his own actual understanding rather than being a mouthing of conclusions which had been told him by others, and (2) the trial judge failed to make a *record* adequately showing that defendant had in fact committed the crime—especially since the record of the conviction proceedings fails to contain the contents of the records of two related murder trials which the judge mentioned that he had read fully and upon which he stated that he relied to be "satisfied" that petitioner had in fact committed the crime charged.

The dispositive answer to the argument upon which petitioner fundamentally relies is our decision, reached by the meticulous analysis previously adduced, that (1) the

*McCarthy* per se error doctrine, supervisorily imposed by the Supreme Court of the United States on the lower federal courts, is without constitutional bearing, under *Boykin,* upon State courts, and (2) the State of Maine has declined to adopt it as a matter of its own State policy. Nullification of petitioner's guilty plea and conviction fails, therefore, to flow automatically from the asserted procedural violations of Rule 11 M.R.Crim.P., even were it true that such violations had in fact occurred.

Hence, and as we have previously explained, petitioner can now prevail only if he succeeds in establishing, on the assumption that there were Rule 11 M.R.Crim.P. violations by the trial judge, that the State has failed to meet the ultimate burden of presenting a total record, as developed in both the conviction and post-conviction proceedings, which is adequate to show (1) that the guilty plea had been voluntarily and understandingly tendered, and (2) contained information which was, or could have been, made known to the trial judge warranting a reasonable conclusion that defendant had in fact committed the crime charged.

In the present situation, even though we assume, arguendo, without deciding, that there might have been some Rule 11 M.R. Crim.P. procedural inadequacies in the trial Court, petitioner must be denied the right to plead anew. The total record before us for review establishes the validity of petitioner's guilty plea.

Amply demonstrated is the voluntariness and intelligence of petitioner's plea. The total record reveals that while petitioner was in process of being tried before a jury on a charge of murder,[9] petitioner, after

tion record showing that the trial judge was in fact aware of the information. We consider it sufficient to require only that it could have been made known to the trial judge had he inquired for it before there had been the entry of judgment of conviction.

9. The murder indictment against petitioner was predicated upon the "felony-murder" rule—the State claiming murder against petitioner on the ground that petitioner had been a principal in the commission of the felony of robbery during, and because of, which a person had been killed.

advice and with agreement of counsel, decided to plead guilty to robbery. Petitioner explicitly admitted in the post-conviction record that he knew that his plea of guilty was a surrender of his right to jury trial. The testimony of his attorney confirmed this understanding by petitioner. Since petitioner had thus already demanded and received a jury trial and while it was in process decided to terminate it and forego any further jury trial, it is hardly open to doubt that petitioner knew exactly what it meant to decline a jury trial, thereby to relinquish rights to be confronted by the witnesses against him and to have his guilt proved beyond all reasonable doubts.

That the waiver of jury trial by petitioner, including all the rights and privileges incident to it, was voluntary and understanding is likewise abundantly shown. Petitioner had been fully informed in explicit detail by his attorney of the evidence which had been produced at two other jury trials for murder—each predicated on the incident in which petitioner had participated and in each of which the defendant had been found guilty of murder. One of the convicted defendants was the man who had fired the shot which had caused the death involved. The other had been convicted of murder, even though he was not directly connected with the shooting, because he was a participant in the robbery, —an application of the "felony-murder" rule which was likewise being invoked by the State against petitioner. Petitioner had been fully advised by his attorney, again in explicit detail, of the meaning of the "felony-murder" rule as well as of the legal concept of robbery and the facts necessary to be proved, (and which the State would most probably be able to prove against the petitioner), to have the "felony-murder" rule govern in his trial.

In the same vein, counsel had carefully and specifically made clear to the petitioner the differences in the maximum penalties for murder and robbery, as did the trial judge. Petitioner himself conceded that he knew full well that the penalty for murder is mandatory life imprisonment and that the penalty for robbery is "any term of years." In addition, petitioner had been informed by his attorney that because robbery is punishable by "any term of years", petitioner was subject to the imposition of a sentence for robbery which "could conceivably be even a longer sentence than you would have if you were sentenced to life imprisonment."

Thus, petitioner had been fully informed of, and understood, the nature of the charge against him and the consequences of his plea of guilty (1) as subjecting him by his own consent, and without trial and the rights and privileges incident thereto, to the imposition of criminal punishment, and (2) as involving differing maximum penalties for robbery and murder and differing potentials for the duration of actual confinement in prison in light of parole eligibility.

Against the background of thorough and precise information explicitly conveyed to petitioner initially, and independently, by counsel—as well as subsequently in conjunction with the interchange among the trial judge, the petitioner and his attorney when the guilty plea was under consideration by the Court for acceptance—petitioner tendered, and allowed to be accepted and entered, his plea of guilty to the crime of robbery.

The total record is thus clear that petitioner acted with deliberation, voluntarily, knowingly and understandingly. He made a free and intelligent choice to plead guilty because both he and his attorney were strongly convinced, and with justification, that petitioner was facing the difficult alternative that the jury before whom he was being tried could well find him guilty of murder. Petitioner knew that if he were convicted of murder it was certain, mandatory, that he would be sentenced to life imprisonment. Simultaneously, petitioner knew that if he were to plead guilty to robbery, there was a chance that petitioner might receive a sentence for robbery

under which, especially in light of the parole potentiality, he might well serve less time in actual prison confinement; and there was also a strong probability, although the prosecution had made no explicit commitment, that the murder charge would be dropped. Several times in the record both the petitioner and his attorney repeated emphatically that they were acting in terms *only* of *hopes*. There had been no promises, or commitments, of any kind by anyone who was involved, or would have responsibility to act, in the matter. Petitioner, therefore, fully advised by counsel, made the free, intelligent, voluntary and understanding choice to indulge his hopes and take his chances. The gambit, as matters eventuated in fact, failed to produce a sentence conforming to petitioner's fondest hopes—so petitioner now seeks an opportunity for a second chance.

The Supreme Court of the United States said in Brady v. United States, supra, that a guilty plea does not become "compelled" —i. e., deprived of its voluntary character, merely because

" . . . the defendant might never plead guilty absent the possibility . . . that the plea will result in a lesser penalty than the sentence that could be imposed after a trial and a verdict of guilty. . . . " (397 U.S. p. 751, 90 S.Ct. p. 1470.)

or because of the circumstances that the plea was

"motivated by the defendant's desire to accept the . . . probability of a lesser penalty rather than face a wider range of possibilities extending from acquittal to conviction and a higher penalty authorized by law for the crime charged." (p. 751, 90 S.Ct. p. 1470)

Under all the circumstances shown by the total record before us and which is properly under review, petitioner's plea of guilty was tendered voluntarily and understandingly.

We conclude, further, that the total record reveals factual information which, in most respects, had been made known to the trial judge and which, in other respects insofar as requisite to be disclosed, was available and could have been made known to the judge during the conviction proceedings. This factual information warrants a reasonable conclusion that defendant in fact committed the crime charged.

The record shows that defendant was in fact a principal to the crime of robbery in that (1) he participated directly in the plan to commit a robbery as well as in the spur of the moment plan and decision that the robbery be undertaken at Mr. Hider's store; (2) petitioner had provided the automobile and gun to assist in carrying out the robbery enterprise; and (3) as shown by the record of the sentencing proceedings, the sentencing judge was informed that the robbery had in fact been consummated in the Hider store and the money derived from the robbery had not been divided as it was supposed to be.

Even the question of the extent to which the defendant had been drinking and, therefore, might have been mentally incapable of making a plan for robbery, (thereby to become a principal to the robbery which was executed according to the plan), had been explored. The record made in the conviction proceedings, both at the time of the tendering of the plea and as part of the sentencing, discloses sufficient information to warrant the reasonable conclusion that even though defendant had been drinking "to a great extent", defendant's attorney had represented to the Court (at sentencing) that his understanding of the circumstances was that defendant was under the influence of intoxicating beverages rather than being intoxicated. The attorney for the State asserted that the State had evidence that the defendant was not so much under the influence that he would be incapable of making a plan or of continuing with its implementation because "he wasn't mindful of the precise nature or quality of his acts." In light of such inde-

pendent affirmative showing, dealing explicitly with the consumption of alcoholic beverages and the influence which it had on the mental capability of the defendant, there appears of record adequate information to justify, as a reasonable conclusion, that petitioner had the requisite mental capability to be a principal to robbery—even in the face of petitioner's own, otherwise uncorroborated, statements in the post-conviction proceeding that he had been too drunk at the time of the crime to know what he was doing or what was transpiring.

The total record before us for review establishes that the guilty plea and the judgment of conviction resting upon it were valid.

We, therefore, reject petitioner's claim that he be allowed to plead anew.

### III.

The two remaining contentions of petitioner may be considered together and dismissed with brief comment.

Petitioner says that the Justice who sentenced him took into account in determining the sentence to be imposed for robbery "that a murder was committed in the course of events leading to the charge against the petitioner." It is said that this was improper because in violation of due process, in accordance with the principle which petitioner alleges had been enunciated by this Court in State v. Pullen, Me., 266 A.2d 222 (1970).

We find nothing in *Pullen* or any other law which has come to our attention which even colorably supports petitioner's claim. *Pullen* explicitly reaffirmed generally established and well recognized law that:

"It [is] . . . proper for the Court to secure a true picture, . . ., of all the surrounding circumstances so that a more enlightened and just sentence could be assessed against the defendant." (p. 230)

The caveat of *Pullen* as to a possible violation of due process relates to the use in sentencing of untrue facts or assumptions predicated upon untrue facts or any other type of misinformation as to material facts and whether caused by carelessness or design. Cf. United States v. Tucker, 404 U. S. ——, 92 S.Ct. 589, 30 L.Ed.2d 592 (January 11, 1972).

No such falsities or material misinformation are here involved. Petitioner's contentions in this aspect are patently meritless.

The final claim of petitioner is essentially an effort to reopen factual aspects relating to the merits of the case by his assertion that he was intoxicated to the degree that he was incapable of having the state of mind, or intent, necessary effectively to plan a robbery or to participate in the implementation of the plan; and, therefore, since he himself did not do the act of robbing, he cannot be held guilty of robbery as a principal by having participated in its planning and continuing implementation.

The argument fails. We have already decided that the petitioner's plea of guilty upon which his conviction was rested is in all respects legally valid. It is, therefore, beyond the scope of post-conviction habeas corpus proceedings to evaluate whether voluntary intoxication might have been a factual defense available to petitioner had his case been fully tried before a jury (or jury waived). Petitioner's valid plea of guilty had settled the issue

"as much so as if the issue had been contested by the petitioner and found against him by the jury. Our post conviction habeas corpus is not a substitute for appeal." Hamner v. State, Me., 223 A.2d 532, 534 (1966)

Also: Cookson v. State, Me., 237 A.2d 589 (1968).

The entry must be:

Appeal denied.

All Justices concurring.

WEBBER, J., did not sit.